Lawrence **BAER**, Plaintiff,

v.

Dr. **Richard BAER**, Jane Doe Baer, Michael E. Trauscht, Wayne Howard, Joseph Alexander, Sr., Joseph Alexander, Jr., Esther Alexander, Kevin Gilmartin, Michele Tunis, Side Mitchell Mack, Gary Scharff, Larry Gumbiner, Freedom of Thought Foundation, a corporation, and Does 1–100, inclusive, Defendants.

No. C–77–0550 SW.

United States District Court, N. D. California.

April 14, 1978.

482

Paul Mike Goorjian, San Francisco, Cal., for Mrs. Martin Durst.

Goorjian & McCabe, San Francisco, Cal., for Mrs. Martin Durst and conservatee.

Friedman & Sloan, San Francisco, Cal., for conservatee.

Albert R. Vermeire, Monbleau, Vermeire & Turley, P. C., Phoenix, Ariz., for defendants Michael E. Trauscht and Wayne Howard.

Lewis, Rouda & Lewis, Marvin E. Lewis, Sr., Maja K. Hanks, San Francisco, Cal., Ralph L. Baker, Oakland, Cal., for plaintiff.

Baker, DeOme, Talarides, Nelsen & Batchelder, Oakland, Cal., for conservatee and plaintiff.

Shapiro, Shapiro & Shapiro, San Anselmo, Cal., for defendant Kevin Gilmartin and Freedom of Thought Foundation.

Gilmore F. Diekmann, Jr., Bronson, Bronson & McKinnon, San Francisco, Cal., for defendants Dr. and Mrs. Baer.

## MEMORANDUM OPINION AND ORDER

SPENCER WILLIAMS, District Judge.

The parties are before the court on defendants' motion for partial judgment on the pleadings pursuant to Rule 12(c) or for partial summary judgment pursuant to Rule 56 on federal claims arising under the Civil Rights Act. Defendants maintain the complaint fails to state a claim upon which relief can be granted: (1) under 42 U.S.C. § 1983 because it fails to establish defendants were acting under color of law as required by the terms of the statute; (2) under 42 U.S.C. § 1985(3) because it fails to establish any class-based animus or motivation behind the alleged conspiracy; and (3) under 42 U.S.C. § 1986 because recovery under the statute is contingent upon the existence of a viable claim under 42 U.S.C. § 1985. After careful consideration of the sensitive and complicated constitutional questions raised by the instant controversy

the court concludes that defendants' motion must be granted and judgment entered in their favor on plaintiff's Civil Rights Act claims.

## FACTUAL BACKGROUND

Lawrence Baer, an adult caucasian male, is a follower of the Reverend Moon and a member of the Unification Church. He brings this action against his parents and the Freedom of Thought Foundation (hereinafter Foundation) for violations of sections 1983, 1985(3) and 1986 of the Civil Rights Acts, seeking both injunctive and compensatory relief. Federal jurisdiction is premised upon diversity as well as federal question grounds, and pendent jurisdiction is asserted with regard to non-federal tort claims for abuse of process, false imprisonment, assault and battery, and invasion of privacy.

The gravamen of the complaint is that defendants conspired to and did abduct plaintiff with the purpose of coercing him to relinquish his religious beliefs. The Foundation is·alleged to be in the business of "legal deprogramming." Deprogramming, as the term has become known, is the process whereby individuals who are members of certain religious groups are subjected to a scheme of brain-washing or mind control in an attempt to dissuade them of their religious beliefs. The Foundation allegedly obtains its "business" from persons who are in disagreement with the religious beliefs of a relative. In this case, the Foundation and plaintiff's parents allegedly entered into an agreement for plaintiff's abduction and brainwashing. From the complaint's scenario it appears that pursuant to the directions of· the Foundation, Dr. and Mrs. Baer filed a petition in the Superior Court of Marin County requesting their appointment as conservator for their son. After the court issued the requested order agents of the Foundation abducted plaintiff while he was walking with his parents on a street in Sausalito and took him into custody with the assistance of the local police. Defendants then began to deprogram the plaintiff.

As a proximate result of these actions Lawrence Baer claims he was deprived of his rights: (a) to freedom of religion, association and speech, (b) to due process and equal protection of the laws, (c) to be secure in his person and property, (d) to be let alone and (e) to travel freely. These rights, he asserts, are guaranteed by state law and by the First, Fourth, Fifth, Ninth and Fourteenth Amendments.

## THE UNDER COLOR OF LAW REQUIREMENT OF SECTION 1983

To frame a cause of action under 42 U.S.C. § 1983 the plaintiff must allege facts which show the defendants have acted under color of state law or authority and have deprived the plaintiff of a right, privilege or immunity secured by the Constitution and the laws of the United States.[1] *Sykes v. California*, 497 F.2d 197, 200 (9th Cir. 1974); *Cohen v. Norris*, 300 F.2d 24, 30 (9th Cir. 1962); *Oller v. Bank of America*, 342 F.Supp. 21, 22 (N.D.Cal.1972). Where the defendants are private individuals, as in the case at hand, two ways exist in which their otherwise private conduct may become state action within the meaning of § 1983. In the first circumstance, courts deem private individuals to be clothed with the authority of the state when it is apparent their actions are substantially identical to actions taken by the state. *See, e. g., De Carlo v. Joseph Horne & Co.*, 251 F.Supp. 935 (W.D.Pa.1966). As one court has observed:

> The key feature of this type of liability is that the individual possesses power, conferred by statute or otherwise, which the ordinary citizen does not possess and

---

1. Rev.Stat. § 1979, 42 U.S.C. § 1983 provides: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

which allows the individual to take actions normally associated with those taken by public officials acting on behalf of the state. *Dennis v. Hein,* 413 F.Supp. 1137, 1140 (D.S.C.1976).

*See also Oller v. Bank of America,* 342 F.Supp. at 23.

■ More often, private action is deemed state action because the individual wilfully participates in joint activity with the state or its agents. *See, e. g., Adickes v. S. H. Kress and Co.* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hoffman v. Halden,* 268 F.2d 280 (9th Cir. 1959). The test of whether a joint participation or conspiracy exists is whether the facts alleged demonstrate that the private individual and the public official acted with a common understanding or "meeting of the minds" to deprive the plaintiff of his constitutionally protected rights. 398 U.S. at 156, 90 S.Ct. 1598. *See Hoffman v. Halden,* 268 F.2d at 294. Lawrence Baer contends the defendants in the instant case acted under color of law both because they were cloaked with state authority and because they were acting in concert with state officials. As this court observed in *Oller v. Bank of America,* 342 F.Supp. at 23, however, "[t]he requirement of 'State action' can rarely be satisfied when the action is taken by one not a State official."

■ Although plaintiff alleges defendants acted under color of the California conservatorship law to deprive him of his constitutional rights,[2] it is well established that "the fact that in the deprivation resort was had to the courts of the state does not supply the necessary state action." *Phillips v. Bridge Structural and Ornamental Iron Workers Local 118,* 556 F.2d 939, 940 (9th Cir. 1977). *Accord, Taylor v. Nichols,* 558 F.2d 561 (10th Cir. 1977) (filing a claim and testifying at trial); *Hill v. McClellan,* 490 F.2d 859 (5th Cir. 1974) (conspiring to enter a default judgment); *Brown v. Dunne,* 409

F.2d 341 (7th Cir. 1969) (petitioning for a conservatorship order); *Weisser v. Medical Care Systems, Inc.,* 432 F.Supp. 1292 (E.D. Pa.1977) (filing a complaint); *Coltharp v. Cutter,* 419 F.Supp. 924 (D.Utah 1976) (executing a writ of garnishment); *Dennis v. Hein,* 413 F.Supp. 1137 (D.S.C.1976) (swearing out an arrest warrant); *Firnhaber v. Sensenbrenner,* 385 F.Supp. 406 (E.D.Wisc. 1974) (obtaining a temporary restraining order); *Weise v. Reisner,* 318 F.Supp. 580 (E.D.Wisc.1970) (petitioning for an order for a mental examination). Such disinterested and indirect involvement by the state is too insignificant to bring the discrimination within the pale of constitutional prohibitions. *See Hill v. McClellan,* 490 F.2d at 860; *Weisser v. Medical Care Systems, Inc.,* 432 F.Supp. at 1295; *Firnhaber v. Sensenbrenner,* 385 F.Supp. at 410. Because the courts are open to all persons the state confers no power upon any one individual that another does not possess. Defendants here did not possess any special aura of state authority because their actions were not those normally taken by public officials acting on behalf of the state. In petitioning the Marin County Superior Court for an ex parte conservatorship order defendants were exercising a power not conferred by statute upon a select few but upon all citizens of the state.

This court is fortified in its conclusion that defendants did not act under color of law when they resorted to the state court for an ex parte conservatorship order by an analogous Seventh Circuit case. In *Brown v. Dunne,* 409 F.2d 341 (7th Cir. 1969), the plaintiff alleged defendants had fraudulently petitioned for and obtained a state court order appointing one of them as conservator for plaintiff's client. The plaintiff further alleged the court thereafter issued a citation ordering him to produce certain documents. As a result of these proceedings plaintiff claimed he had been denied his constitutional rights to due process and

2. Plaintiff does not challenge the constitutionality of this law. 1957 Cal.Stats., ch. 1902, § 1 (current version at Cal.Prob.Code § 1751 (West Supp. 1978) ). Rather, the gist of the complaint is that defendants did not follow the

procedure it prescribed. *Cf. Coltharp v. Cutter,* 419 F.Supp. 924 (D.Utah 1976) (§ 1983 complaint based on wrongful use of garnishment law).

equal protection of the law. The district court dismissed the complaint brought under § 1983 on the ground that the essence of the claim was defendant had misused a state forum and process in causing the alleged deprivation and such conduct was insufficient to state a claim for which relief could be granted. The Seventh Circuit affirmed and responded as follows to the argument that state action existed by virtue of defendants' resort to the state courts:

> Plaintiffs argue that the defendants used the Illinois statutes 'as a mask and shield for the commission' of the 'criminal' and 'tortious' conduct charged in the complaint. This argument supports the district court's view that plaintiffs' real complaint is that defendants misused the statutes in a state forum. This does not present a denial of rights under the Fourteenth Amendment, or a claim upon which relief could be granted under the Civil Rights Act. 409 F.2d at 343 (citations omitted).

■ Likewise, plaintiff here argues defendants used the California conservatorship law as a "cover" for the commission of the tortious conduct alleged in the complaint. His pendent state claim for abuse of process is incorporated by reference into his § 1983 claim and specifically alleges that defendants "knowingly and fraudulently misused the conservatorship/guardianship process" and that defendants' "ulterior purpose" in so misusing state process was "to obtain custody of plaintiff so that they could spirit him to Arizona, imprison him and subject him to brainwashing and mind-control in an effort to dissuade him of his religious beliefs." This private misuse of California law presents neither a denial of constitutional rights under the Fourteenth Amendment nor a claim upon which relief could be granted under the Civil Rights Act.

Plaintiff also relies on the joint participation or conspiracy method of establishing defendants acted under color of state law. In support of this proposition he refers to the paragraph of the complaint in which it is alleged that "uniformed members of the Sausalito Police Department and agents or employees of the Foundation forcibly took Plaintiff into custody." He also points to the portions of the complaint mentioning the Marin County Superior Court as indicative of the fact that the judge who issued the conservatorship order is implicated as well. Admitting he has not alleged a conspiracy between the state officials and the defendants, plaintiff asserts he has met his burden by alleging "joint participation."

■ The issue raised by the allegations of "joint participation" in the complaint is not simply whether facts alleging a lesser level of concerted activity will suffice to state a claim under § 1983, but whether the complaint states sufficient facts to establish that the state officials, mentioned but not named as party defendants, participated in the wrongful conduct with the shared intention of depriving plaintiff of his constitutional rights. There is nothing magical about the word "conspiracy," and courts have held that a showing of concerted activity will suffice to state a claim under § 1983. See, e. g., Canty v. City of Richmond, 383 F.Supp. 1396 (S.D.Va.1974), aff'd, 526 F.2d 587 (4th Cir. 1975), cert. denied, 423 U.S. 1062, 96 S.Ct. 802, 46 L.Ed.2d 654 (1976). No matter how significant the joint activity alleged, however, the complaint must still allege that the private defendant and the public official acted with a common understanding or "meeting of the minds" to deprive the plaintiff of his constitutional rights. Adickes v. S. H. Kress and Co., 398 U.S. at 156, 90 S.Ct. 1598. See Hoffman v. Halden, 268 F.2d at 294. Where the plaintiff fails to make this critical allegation a court must dismiss his complaint for failure to state a claim upon which relief can be granted. See, e. g., Harris v. Ward, 418 F.Supp. 660 (S.D.N.Y.1976); Meyer v. Curran, 397 F.Supp. 512 (E.D.Pa.1975).

■ There is no allegation in the complaint that the Sausalito police were a part of a conspiracy between Lawrence Baer's parents and the Foundation to deprive him of his constitutional rights. Neither is there any allegation that the police shared this goal. The facts pleaded show only that

the police assisted in the effectuation of a court order, which is insufficient to establish that defendants and the police came to a "meeting of the minds." The same is true with respect to the superior court judge. There is no allegation in the complaint that the judge was conspiring with the defendants, or, short of conspiring with them, shared their intention to deprive Lawrence Baer of his constitutional rights. The complaint, therefore, fails to state a § 1983 claim upon which relief can be granted under the second method as well as the first.

Assuming for the moment plaintiff could amend his complaint to allege a conspiracy between the public officials and the defendants he would still have to allege sufficient facts to overcome the immunity from liability courts have granted public officials in § 1983 suits. "Private persons cannot be held liable for conspiracy under the Civil Rights Statutes if the other conspirators are state officials who are themselves immune to liability under the facts alleged." *Sykes v. California (Department of Motor Vehicles),* 497 F.2d 197, 202 (9th Cir. 1974). *See Haldane v. Chagnon,* 345 F.2d 601, 604–605 (9th Cir. 1965).

■ It is well established that judges are absolutely immune from liability for acts done in the performance of their judicial functions. *Pierson v. Ray,* 386 U.S. 547, 553–55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Robinson v. McCorkle,* 462 F.2d 111 (3rd Cir. 1972); *Haldane v. Chagnon,* 345 F.2d at 604. "The only exception to this sweeping cloak of immunity exists for acts done in 'the clear absence of all jurisdiction.'" *Gregory v. Thompson,* 500 F.2d 59, 62 (9th Cir. 1974). For an act to be done in the

clear absence of all jurisdiction it must not be of a judicial nature.[3] 500 F.2d at 63. Thus, plaintiff in this case must demonstrate that the superior court judge overstepped his judicial bounds in order to state a viable § 1983 cause of action based upon his participation in defendants' activities. Given the facts as pleaded, however, it is highly unlikely plaintiff could show the judge was doing anything other than performing a routine judicial function when he issued the ex parte conservatorship order.

■ Unlike judges, police officers only enjoy a qualified immunity for acts done in the performance of their official functions. Their immunity extends only to acts taken in good faith and upon a reasonable belief. *Pierson v. Ray,* 386 U.S. at 587, 87 S.Ct. 1213 (1967); *Milton v. Nelson,* 527 F.2d 1158, 1159 (9th Cir. 1976).[4] Once it is established a defendant officer was acting pursuant to his official duties, the burden shifts to the plaintiff to demonstrate the officer was not acting in good faith. 527 F.2d at 1160. No such showing has been made by plaintiff in this case. Naturally, if the complaint fails to allege the police officers and defendants acted with a common understanding to deprive plaintiff of his constitutional rights, it would be most remarkable if it alleged the police officers acted independently with that same purpose. The facts pleaded demonstrate only that the police assisted in the effectuation of a court order which was valid on its face. Hence, from the complaint itself it is apparent a good faith defense would defeat the § 1983 cause of action alleged. To state a viable claim plaintiff must amend his complaint to show that the Sausalito police

---

**3.** Judicial immunity thus includes judicial acts done maliciously or corruptly. *Pierson v. Ray,* 386 U.S. at 554, 87 S.Ct. 1213. Moreover, although the wrongful act may have been committed under a repealed statute, or one that is subsequently held unconstitutional, such judicial misuse does not remove the shield of immunity. *Robinson v. McCorkle,* 462 F.2d at 113. Therefore, the fact that the First District Court of Appeal recently held unconstitutional the provisions of former § 1751 of the Califor-

nia Probate Code pursuant to which Dr. and Mrs. Baer obtained the ex parte conservatorship order does not affect plaintiff's chances of avoiding the bar of judicial immunity. *Katz v. Superior Court,* 73 Cal.App.3d 952, 141 Cal. Rptr. 234 (1977).

**4.** As is the case with judges, an officer's good faith enforcement of a law that is subsequently held to be invalid is still a good defense to a § 1983 suit. *Milton v. Nelson,* 527 F.2d at 1160.

acted in bad faith when they assisted defendants in abducting plaintiff.[5]

██ The complaint as presently drafted fails to state a claim under 42 U.S.C. § 1983 because it fails to allege action under color of state law. Accordingly, defendants are entitled to judgment on the pleadings dismissing the § 1983 cause of action. Plaintiff, however, has requested leave to amend if dismissal is granted. Since it appears to the court that amendment would be futile in most respects, plaintiff is given leave to amend his complaint only if he can allege facts sufficient to demonstrate a conspiracy of the variety described in this memorandum involving defendants and the Sausalito Police department.[6]

## SECTION 1985(3), CLASS BASED ANIMUS AND CONGRESSIONAL POWER

██ A claim based on § 1985(3) must allege all of the following elements: (1) a conspiracy to go in disguise on the highway or on the premises of another; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy resulting in; (4) injury to the person or to property or deprivation of any of the rights or privileges of a citizen.[7] *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). To avoid transforming this provision of the Civil Rights Act into a general federal tort law, the Supreme Court in *Griffin* construed the second element as requiring a class-based animus akin to racial discrimination:

> The language requiring intent to deprive of *equal* protection or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. 403 U.S. at 102, 91 S.Ct. at 1798.

The Ninth Circuit has further explained this requirement in the following manner:

> [T]he statutory action is restricted to injuries inflicted upon the victim because of his status as a member of an identifiable class; the statutory "purpose to deprive of equal rights" requirement is inferred

**5.** Defendants request summary judgment on the ground plaintiff himself has refuted the allegation in the complaint that the Sausalito police were present when he was abducted. When answering interrogatories requesting him to list all persons who were present at the time he was taken into custody plaintiff did not include any Sausalito police officers. If this answer is correct there would be no basis for inferring that a conspiracy existed between defendants and the police. Nevertheless, it is improper for this court to consider materials outside the pleadings in ruling on a Fed.Rule Civ.Pro. 12(c) motion for summary judgment. *Condosta v. Vermont Electronic Cooperative,* 400 F.Supp. 358, 364–65 n. 15 (D.Vt.1975); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 113 (S.D.N.Y.1975); 5 Wright and Miller, Federal Practice and Procedure § 1369. If defendants wish to establish that plaintiff cannot as a matter of law prevail on a § 1983 claim premised on a theory of conspiracy between defendants and the local police, they must move for summary judgment after plaintiff realleges a § 1983 cause of action. Only by submitting affidavits from the witnesses to plaintiff's abduction establishing that no policemen were present at that time can defendants meet their burden of showing the absence of a genuine issue as to this material fact. *See*

*Adickes v. H. S. Kress and Co.,* 398 U.S. at 153–59, 90 S.Ct. 1598.

**6.** This is not to suggest this court would look with favor upon an attempt to bring new parties into the litigation at this late date.

**7.** Rev.Stat. § 1980, 42 U.S.C. § 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

from the racial or other class motivation underlying the tortious conduct.

. .. . . .

Under *Griffin*, we think the class status providing the motivating animus must be created by a fact other than possession of the right deprived—otherwise virtually every conspiratorial deprivation of a primary right would be actionable under § 1985(3) . . . *Lopez v. Arrowhead Ranches*, 523 F.2d 924, 927–28 (9th Cir. 1975).

▮ The complaint before the court fulfills the requirements of elements (1), (3) and (4). It alleges that Lawrence Baer was abducted while he was with his parents on a street in Sausalito and thereafter agents of the Foundation detained and restrained him in various places with the intent of coercing him into relinquishing his religious beliefs. This much defendants concede. What defendants dispute is that the class-based animus essential to a § 1985(3) claim is present in this case. .

Most of the allegations in the complaint regarding defendants' motives involve claims that they were engaging in the alleged activities for the purpose of depriving Lawrence Baer as an individual of his constitutional rights. However, plaintiff maintains that the allegation the Foundation holds itself out to be a "business" dedicated to deprogramming members of certain religious "factions" satisfies the class-based animus requirement, insofar as it may be inferred from this alleged purpose of the Foundation that its agents and plaintiff's parents conspired to deprive plaintiff of his constitutional rights because of his status as a member of such a religious group. The court is satisfied the complaint alleges sufficient facts to establish that a class-based animus existed in this case.

A far more important issue raised by the complaint is whether a religious group may be deemed a class for purposes of § 1985(3); it is a question of first impression not only in this court but in the Ninth Circuit as well. In *Griffin* the Supreme Court dealt with an alleged beating of a black man by a group of whites who believed he was a

member of a civil rights organization. The Court had no difficulty in concluding that such racially-motivated discrimination, which "lies so close to the core of the coverage intended by Congress," was redressable under § 1985(3). 403 U.S. at 103, 91 S.Ct. at 1799. Whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would also be actionable the Court did not decide. 403 U.S. at 102 n. 9, 91 S.Ct. 1790. While leaving this question open the Court cited the remarks of Senator Edmunds during the congressional debate of the passage of the Civil Rights Act of 1871, the statute in which § 1985(3) was originally codified. Asked whether the section dealing with conspiracy to obstruct justice (now codified as § 1985(2)) was intended to embrace the states, Senator Edmunds, a Republican from Maine, replied:

> Certainly, referring to the "equal and impartial course of justice" mentioned in the second section of the third page. This obstruction of the equal and impartial course of justice, however, must, under the provisions of all this bill, go so far as to deny and withhold from citizens of the United States that equality of protection in seeking justice which the Constitution of the United States gives them. We do not undertake in this bill to interfere with what might be called a private conspiracy growing out of a neighborhood feud of one man or set of men against another to prevent one getting an indictment in the State courts against men for burning down his barn; but, if in a case like this, it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, . . . then this section could reach it. Cong.Globe, 42d Congress, 1st Sess. 567 (1871) (remarks of Senator Edmunds).

This passage demonstrates that the 1871 Congress did consider the possibility that § 1985 would be applied in general to classes of citizens other than racial groups and in particular to religious groups.

Since *Griffin* several federal appellate and district courts have extended the protection of § 1985(3) to religious groups. Shortly after the Supreme Court decided *Griffin,* the Eighth Circuit in *Action v. Gannon,* 450 F.2d 1227 (8th Cir. 1971), allowed white parishioners to bring a § 1985(3) cause of action against black defendants who were allegedly stimulated by racial and economic motives when they disrupted church services. Two years later the Sixth Circuit held that a claim for employment discrimination was actionable by a plaintiff-employee who was a member of the Jewish faith. *Marlowe v. Fisher Body,* 489 F.2d 1057 (6th Cir. 1973). Moreover, a district court in the District of Columbia held, based on facts similar to those in the instant case, that a complaint alleging a conspiracy between plaintiff's parents and other parents to "convert" plaintiff from his adherence to a religious group known as the "Children of God" stated a cause of action under § 1985(3) because it paralleled the complaint approved by the Supreme Court in *Griffin. Mandelkorn v. Patrick,* 359 F.Supp. 692, 697 (D.D.C.1973). Finally, district courts in both the Third and Ninth Circuits have indicated religious groups could constitute a class for purposes of § 1985(3). *Jackson v. Associated Hospital Service of Philadelphia,* 414 F.Supp. 315 (E.D.Pa.1976), *aff'd,* 549 F.2d 795 (3d Cir. 1977); *Western Telecasters, Inc. v. California Federation of Labor,* 415 F.Supp. 30, 33 (S.D.Cal.1976), *citing with approval Arnold v. Tiffany,* 359 F.Supp. 1034, 1036 (C.D.Cal. 1973), *aff'd on other grounds,* 487 F.2d 216 (9th Cir. 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974) ("A close reading of *Griffin* leads this Court to conclude that the words 'class-based, invidiously discriminatory animus' refer, at most, to that kind of irrational and odious class discrimination akin to racial bias—such as discrimination based on national origin or religion.")

[17] Although by no means compelling, the above authorities support this court's conclusion that the religious followers of the Reverend Moon constitute a class within the meaning of § 1985(3). This dispute has many of the earmarks of a case involving racial discrimination. The raison d'etre of the Foundation is to deprogram members of particular religious groups whose views the Foundation finds repugnant. A fair and reasonable reading of the complaint demonstrates the Foundation singled out Lawrence Baer because of his status as a member of such a group, namely the Unification Church, and not because of his individual beliefs. In other words, this class status is not created by the mere fact plaintiff possesses the right to freedom of religion, as do all persons, but rather by the fact he is a member of a fringe or minority religious group. It is defendants' abhorrence of this group that motivates them to deprogram individuals such as plaintiff. While religious status may differ from racial status because it is not a congenital and inalterable trait, membership in a minority religious group, like membership in a minority racial group, has often excited the fear, hatred and irrationality of the majority. Two thousand years of human history compellingly prove that no easier road to martyrdom is found than in adherence to an unpopular religious faith. For these reasons, and because the legislative history does not indicate otherwise, this court concludes that religious discrimination may be encompassed by the terms of § 1985(3).

 Once it is established that the complaint sufficiently alleges the elements of a § 1985(3) cause of action, however, the court must observe the teachings of *Griffin* and identify a source of congressional power to reach the private conspiracy so alleged. *Griffin v. Breckenridge,* 403 U.S. at 104, 91 S.Ct. 1790. The Supreme Court found two sources of power to reach the conspiracy alleged in *Griffin:* § 2 of the Thirteenth Amendment and the right of interstate travel.[8] With regard to the lat-

---

8. The Court reaffirmed that "the right of interstate travel is constitutionally protected, does

not necessarily rest on the Fourteenth Amendment, and is assertable against private as well

ter, the allegations that petitioners "were travelling upon the federal, state and local highways" and were exercising their right "to travel the public highways without restraint" created a basis for petitioners to prove they had been engaging in or intended to engage in interstate travel, and that their right of interstate travel was one of the rights meant to be discriminatorily impaired by the conspiracy. 403 U.S. at 106, 91 S.Ct. 1790. No such basis for invocation of the power to protect the right of interstate travel exists in this case. Lawrence Baer alleges he was abducted while on a street in Sausalito and was thereby deprived of his right "to travel freely." Although the fact plaintiff was on a street may satisfy the requirement that defendants conspired to "go in disguise on the highway," it does not establish that plaintiff was engaging in or intended to engage in interstate travel at the time. Nor does the allegation plaintiff was deprived of his right "to travel freely" on public streets establish that his federal right of interstate travel was one of the rights defendants' conspiracy meant to impair. Therefore, plaintiff has failed to allege he has suffered from tortious conduct which Congress may reach under its power to protect the right of interstate travel.[9]

The Supreme Court also held in *Griffin* that the creation of a statutory cause of action for black persons who have been the victims of racially motivated private conspiracies was a valid exercise of Congress' power to enforce the guarantees of the Thirteenth Amendment. 403 U.S. at 105, 91 S.Ct. 1790. The Court found support for this conclusion in *Jones v. Alfred H. Meyer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), where it had determined the Civil Rights Act of 1866, in particular the provision presently codified as 42 U.S.C. § 1982, was an appropriate vehicle for reaching private racial discrimination in the sale and rental of property. Justice Stewart, writing for the Court in *Jones* and later

writing for the Court in *Griffin,* construed § 2 of the Thirteenth Amendment as conferring upon Congress broad power to abolish all the badges and incidents of slavery. 392 U.S. at 439, 88 S.Ct. 2186. To perform that task Congress must have the substantive power "rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation." 392 U.S. at 440, 88 S.Ct. at 2203. Since Congress could rationally determine private discrimination in the sale and rental of property was a vestige of slavery, the Court held that § 1982, which bars all such discrimination, whether public or private, was a valid exercise of Congress' power to enforce the Thirteenth Amendment. 392 U.S. at 413, 88 S.Ct. 2186.

This interpretation of the substantive power of Congress under § 2 was recently reaffirmed by the Supreme Court in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). There, the Court addressed the same question that had been raised in *Jones,* this time with respect to 42 U.S.C. § 1981, which was also originally codified in the Civil Rights Act of 1866. Adopting the *Jones* rationale, Justice Stewart, again writing for the Court, concluded that the refusal of petitioner private schools to enter into a contractual relationship with respondents because of their race constituted an enforceable violation of § 1981. 427 U.S. at 170–71, 96 S.Ct. 2586. All the same, the Court made it clear that the conduct in question came within the express purview of the Civil Rights Act, and therefore there was no question of the right of a private school to refuse to admit applicants on any basis other than race. 427 U.S. at 167, 96 S.Ct. 2586.

 Whether § 2 of the Thirteenth Amendment empowers Congress to regulate private discrimination not based on

---

as governmental interference." 403 U.S. at 105–06, 91 S.Ct. at 1800, and cases cited therein.

9. This court also perceives no basis upon which congressional power under the commerce clause could be invoked to reach the private conspiracy in this case.

race is an open question.[10] Nevertheless, for this court to hold that § 1985(3) as applied to a private religious conspiracy is a valid exercise of Congress' § 2 power would require, preliminarily, a judicial determination that Congress has concluded the badges and incidents of slavery are borne by religious minorities as well as racial minorities.[11] *See* Buchanan, *The Quest for Freedom: A Legal History of the Thirteenth Amendment*, 12 Hous.L.Rev. 331, 843, 1080; 13 Hous.L.Rev. 63 (1975); Note, *Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments*, 74 Colum.L.Rev. 449, 500–05 (1974). The Supreme Court has yet to interpret § 2 of the Thirteenth Amendment as conferring upon Congress the power to enact a statute creating a cause of action against racially motivated private interference with the bill of rights guarantees, *see Runyon v. McCrary*, 427 U.S. at 167 n. 6, 96 S.Ct. 2586, even though such an interpretation would be a logical extension of the *Jones* rationale. Faced with this uncertainty in the law, it would be unwise for this court to hold that § 2 of the Thirteenth Amendment empowered Congress to grant civil redress under § 1985(3) for private conspiracies denying freedom of religion. Since neither of the sources of congressional power found sufficient in *Griffin* are availing here, this court must look elsewhere in the Constitution for congressional power to reach this conspiracy.

Undoubtedly because the Supreme Court has never expanded the scope of Congress' § 2 power beyond the protection of racial minorities, courts considering congressional power to reach private conspiracies under § 1985(3) have looked to the enforcement clause of the Fourteenth Amendment. At first blush it seems more logical that the power to enforce the guarantees of equal protection and due process would support a law proscribing private conspiracies to deny religious freedom than the power to eradicate badges and incidents of slavery. Yet decisions of the Supreme Court interpreting the substantive power of Congress under § 5 of the Fourteenth Amendment reveal significant uncertainty that § 5 power will suffice where § 2 power fails.

No single interpretation of the expanse of Congress' § 5 power has consistently commanded the adherence of a majority of the members of the Supreme Court. In *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), the Court first confronted the question whether Congress could use its § 5 power to outlaw conduct that the Court had not yet determined to be violative of the Fourteenth Amendment's guarantee of equal protection. Section 4(e) of the Voting Rights Act of 1965, at issue in *Katzenbach*, forbad any state denial of the right to vote because of illiteracy in the English language. In an opinion by Justice Brennan, the Court held that § 5 empowers Congress to enact such preventative legislation rationally aimed at state conduct not expressly prohibited by the Fourteenth Amendment. 384 U.S. at 653, 86 S.Ct. 1717. Moreover, the Court indicated Congress also has the authority to determine what constitutes invidious dis-

---

**10.** It should be noted, however, congressional legislation effectuating the Thirteenth Amendment's express prohibitions of slavery and involuntary servitude applies to all groups and not just to racial minorities. *See, e. g., Clyatt v. United States*, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726 (1905) (holding the federal peonage statutes, 42 U.S.C. § 1994 and 18 U.S.C. § 1581, to be a valid exercise of congressional power to enforce the prohibition of involuntary servitude of all persons regardless of their race).

**11.** Unlike §§ 1981 and 1982, § 1985 was originally codified in the Civil Rights Act of 1871 which was enacted to enforce the provisions of the Fourteenth Amendment. One commentator has concluded after analyzing the legislative history of the 1871 Act that the provisions relating to private conduct provoked heated debate and a split of opinion on the question of congressional power to reach such conduct. Even those leaders who had advocated a maximum view of congressional power during the debates surrounding the passage of the Civil Rights Act of 1866 reversed their position during the debates surrounding the passage of the Act of 1871. Buchanan, *The Quest for Freedom: A Legal History of the Thirteenth Amendment*, 12 Hous.L.Rev. 331, 339–40 (1975).

crimination violative of the equal protection clause, limited only by a judicial finding that there exists a rational basis upon which Congress might rest its judgment. 384 U.S. at 656, 86 S.Ct. 1717.

Only four years later, however, Justice Brennan could not muster a majority of the Court in support of his view that § 5 gives Congress definitional authority over the substantive reach of the Fourteenth Amendment. The case, *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), involved the 1970 Amendments to the Voting Rights Act, which, *inter alia*, enfranchised 18-year olds in all elections, federal and state. With Justice Black casting the deciding vote on alternative grounds, the Court held that Congress had the power to change age qualifications for national but not for state elections. Justice Brennan, in a separate opinion joined by Justices White and Marshall, reiterated his position that Congress has the power under § 5 to determine whether invidious discrimination exists and to eradicate such discrimination by appropriate legislation. "It should hardly be necessary to add that if the asserted factual basis necessary to support a given discrimination does not exist [in Congress' judgment], § 5 of the Fourteenth Amendment vests Congress with the power to remove the discrimination by appropriate means." 400 U.S. at 248, 91 S.Ct. at 327, *citing Katzenbach v. Morgan*, 384 U.S. at 656–57, 86 S.Ct. 1717. But Justice Stewart, who had dissented in *Morgan*, disagreed and wrote an opinion joined by Chief Justice Burger and Justice Blackmun in which he argued that *Morgan* did not recognize any power in Congress to define the substantive scope of the equal protection clause.

*Katzenbach v. Morgan, supra*, does not hold that Congress has the power to determine what are and what are not "compelling state interests" for equal protection purposes. . . . The Court's opinion made clear that Congress could impose on the States a remedy for the denial of equal protection that elaborated upon the direct command of the Constitution, and that it could override state laws on the ground that they were in fact used as instruments of invidious discrimination even though a court in an individual lawsuit might not have reached that factual conclusion. *Cf. Swain v. Alabama*, 380 U.S. 202 [, 85 S.Ct. 824, 13 L.Ed.2d 759].

But it is necessary to go much further to sustain § 302. The state laws that it invalidates do not invidiously discriminate against any discrete and insular minority. Unlike the statute considered in *Morgan*, § 302 is valid only if Congress has the power not only to provide the means of eradicating situations that amount to a violation of the Equal Protection Clause, but also to determine as a matter of substantive constitutional law what situations fall within the ambit of the clause, and what state interests are "compelling." 400 U.S. at 295–96, 91 S.Ct. at 350.

Thus, at least three Justices appear to concede that Congress has the power under § 5 to pass preventative legislation to rectify invidious discrimination, but they steadfastly maintain Congress has no such power to determine what constitutes invidious discrimination violative of the Fourteenth Amendment.

*Oregon v. Mitchell* is the Supreme Court's most recent pronouncement on the power of Congress under § 5 of the Fourteenth Amendment. As the above examination of that case reveals, however, the question whether Congress has the power to define the substantive reach of § 5 is still a hotly contested one. This conflict over the extent of Congress' § 5 power is particularly important to the instant case for the following reasons. The Fourteenth Amendment by its express terms is limited to state action, and the Supreme Court has never held that it implicitly prohibits private discrimination. Neither has the Court directly held that § 5 supplied the power for congressional legislation designed to eliminate racial, religious or sexual discrimination in the private sector. Such legislation has been sustained instead as an exercise of Congress' commerce power. *See e. g., Heart of Atlanta Motel, Inc. v. United*

*States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Therefore, the conclusion is inescapable that Congress has the power under § 5 to reach private discrimination *only* if it has the power to define the Fourteenth Amendment's substantive reach.

The closest the Supreme Court has come to holding that Congress has the power under § 5 to regulate private conduct not cloaked with the authority of the state is its decision in *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), involving the criminal analog to § 1985(3). The statute before the Court, section 241 of Title 18 makes it a crime to conspire to interfere with "the 'free exercise or enjoyment' of right or privilege 'secured by . . the Constitution or laws of the United States.'" In *Guest*, a group of whites who had murdered a black man while he was driving on the public highway were charged with conspiring to deprive the victim of his "right to equal utilization" of state facilities. Six justices in two concurring opinions endorsed the view that § 5 empowers Congress to reach private conspiracies interfering with the enjoyment of Fourteenth Amendment rights. But, Justice Stewart delivering the opinion of the Court construed § 241 as only giving remedial implementation to any rights secured against state interference by the equal protection clause. 383 U.S. at 754–55, 86 S.Ct. 1170, at 1181. Moreover, Justice Brennan, author of one of the concurring opinions, specifically addressed the issue at hand as whether a private conspiracy to interfere with the exercise of the right to equal utilization of *state facilities* came within § 241 if there was no state involvement in the alleged conspiracy. 383 U.S. at 774, 780–81, 86 S.Ct. 1170 (Brennan, J., concurring). Thus, it would appear from a fair reading of the case that some form of state involvement is necessary in order for Congress to reach a private conspiracy to interfere with the guarantees of the bill of rights. *See Murphy v. Mount Carmel High School*, 543 F.2d 1189, 1194 (7th Cir. 1976); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504, 507 (4th Cir. 1974); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972).

Only one federal appellate court, the Eighth Circuit, has reached the contrary conclusion.[12] In *Action v. Gannon*, 450 F.2d 1227, 1235 (8th Cir. 1971), the court held that "Congress was given the power in § 5 of the Fourteenth Amendment to enforce the rights guaranteed by the Amendment against private conspiracies." To reach this decision the court relied on the legislative history of the Fourteenth Amendment and the concurring opinions in *Guest*. With all due respect to the Eighth Circuit, however, the congressional debates surrounding the adoption of the Fourteenth Amendment and the subsequent Civil Rights legislation are far from conclusive on the issue of the power of Congress to reach private discrimination. *Compare*, Frantz, *Congressional Power to Enforce the Fourteenth Amendment Against Private Acts*, 73 Yale L.J. 1353 (1964) (advocating Congress intended

---

12. *But see Westberry v. Gilman Paper Co,*, 507 F.2d 206 (5th Cir. 1975) (opinion withdrawn for mootness) (holding that private employee who was a member of an environmental group had a § 1985(3) cause of action for employment discrimination because § 5 of the Fourteenth Amendment was believed to encompass discriminatory acts by private persons).

Although the Third Circuit has also allowed a private employee to recover for employment discrimination under § 1985(3), the court failed to consider whether Congress possessed the power to reach such private discrimination. *See Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971) (holding that a private employee, although not a member of any class, had an actionable claim because he alleged discrimination for advocating racial equality in employment). Likewise, the Sixth Circuit, which has allowed § 1985(3) claims for denial of First Amendment rights, never has addressed the issue whether Congress possesses the power to reach such private discrimination. *See Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975) (holding political protestors were a class and therefore could sue for violation of their right to freedom of expression); *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973) (holding supporters of a political candidate were a class and therefore could sue for violation of their right to distribute pamphlets).

to redress private wrongs) *with* Avins, *Federal Power to Punish Individual Crimes Under the Fourteenth Amendment: The Original Understanding*, 43 Notre Dame Law. 317 (1967) (advocating Congress only intended to redress wrongs committed by state officials). Moreover, only the broadest interpretation of the holding in *Guest* could possibly support the conclusion reached by the Eighth Circuit in *Action*. It is the conclusion of this court, which finds support in the decisions of the Seventh and Fourth Circuits, that it would be unsound in the absence of guidance from the Supreme Court to hold Congress has the power under § 5 of the Fourteenth Amendment to reach the private conspiracy in this case. *Murphy v. Mount Carmel High School*, 543 F.2d at 1195; *Bellamy v. Mason's Stores, Inc.*, 508 F.2d at 507.

■ Aside from the absence of a firm constitutional foothold this court is persuaded by the limits of its own power that § 1985(3) should not be applied to private religious controversies. As a blue print for the exercise of power, the Constitution protects individuals from oppression by government not from private villany. Accordingly, private conduct is left to state regulation or the freedom of individual choice. This is not to say that the past two decades have not witnessed a subtle restructuring of the Constitution. In its wisdom, Congress has determined that private discrimination on grounds of race, religion, sex or national origin, for example, so affects the national welfare that it must be prohibited. See, e. g., Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e et seq. Such restructuring of the Constitution, if it be one, may be justified when accomplished by the representatives of the people after long debate and careful analysis. It is an entirely different matter, however, for a federal trial court with only equivocal legislative history and scant judicial precedent to work the same result. This court has the power to interpret the Constitution and the law but not the power to write its own.

■ Since the complaint establishes no factual basis for finding any form of state involvement, it fails to state a claim upon which relief can be granted under § 1985(3) as well as § 1983. Inasmuch as the § 1985 cause of action is insufficient the allegations under 42 U.S.C. § 1986 must also fail. *Taylor v. Nichols*, 558 F.2d at 568; *Stambler v. Dillon*, 302 F.Supp. 1250, 1257 (S.D. N.Y.1969). Section 1986 is a derivative statute in that it gives a cause of action against a person who neglects to prevent the commission of the wrongful acts done pursuant to § 1985. The complaint fails to state a claim for relief under § 1986 for the same reasons that no valid claim exists under § 1985(3). Accordingly, this court orders that judgment be entered in favor of defendants on these Civil Rights Act claims.